**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| **DOROTHY M. GIPSON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO. 13-0532-KD-M** |
| | ) | |
| **SHERIFF SAM COCHRAN,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**<u>ORDER</u>**

This action is before the Court on the motion for summary judgment and supporting documents filed by defendant Sheriff Sam Cochran (docs. 54-57), the response in opposition filed by plaintiff Dorothy M. Gipson and supporting documents (docs. 62, 63), and Sheriff Cochran's reply and supporting documents (doc. 65, 66). Upon consideration, the motion is DENIED in part and GRANTED in part as set forth herein.

I. <u>Procedural History</u>

On October 30, 2013, Plaintiff Dorothy M. Gipson filed her complaint against Sheriff Sam Cochran alleging violations of Title VII of the Civil Rights Act of 1991, and the Uniformed Services Employment and Reemployment Rights Act of 1994 (USERRA) (doc. 1). Gipson alleges that Sheriff Cochran violated USERRA by extending her probationary period due to absences for military training and refusing to provide the same training as other deputies, and by terminating her employment. (Count 1) Gipson also alleges that Sheriff Cochran discriminated against her on basis of sex by treating similarly situated male officers differently in the terms and conditions of employment, application of work rules,

extension of probation and termination (Count 2). [1]  As relief, Gipson seeks declaratory and injunctive relief as to the alleged sex discrimination and violation of USERRA, reinstatement to the position of deputy, back-pay plus interest, compensatory and liquidated damages, costs, attorney's fees, and expenses.

II.  <u>Findings of Fact</u>

Dorothy Gipson, a female, was hired as a Deputy Sheriff on March 19, 2011. Gipson was a member of the United States Air Force Reserve during her employment with defendant Sheriff Cochran.  Before she was hired, Gipson had been a police officer with the City of Prichard, Alabama.

Gipson was required to go through a "Working Test Period" or probation for one year.  A deputy initially goes through Field Training and is assigned a Field Training Officer (FTO). The FTO documents the deputy's work performance and training on a daily and weekly basis. Field Training is scheduled to last 8 weeks and at such time the new deputy is deemed able to perform the job solo and is assigned to a squad. Once assigned to a squad, the new deputy is evaluated quarterly with the expectation of completing the Working Test Period within a year of being hired.  If the Working Test Period is successfully completed, the deputy then becomes a permanent deputy.

Gipson's first FTO Sergeant's Weekly Report is dated March 21, 2011 through March 27, 2011. (Doc. 63-12, p. 1) During her eight weeks of field training her performance was generally rated as "Acceptable" and during the last four weeks her performance was "Acceptable" but for driving skills which were marked as "Unacceptable" (Doc. 63-12, p. 7-

---

[1]  In the response to the motion for summary judgment, Gipson conceded Count 3 for retaliation under Title VII and 42 U.S.C. § 1981.

10).  Most of the "Comments" indicated that Gipson's work was "Good" but for driving

skills. (Id.)  At the 8th week, Sergeant Lori O'Farrell indicated that Gipson was performing

at "solo deputy level" but recommended "one week of extended training with being

assigned to the north side to assure she is ready to be released from FTO training." (Doc.

63-12, p. 10)[2]

---

[2] The Daily Observation Reports from March 24, 2011 through June 19, 2011, indicate that Gipson's performance was rated "o.k." or "acceptable" or "not observed" (Doc. 63-10; 63-11).  She was marked "not acceptable" for driving skills on two occasions occasion, which were related to use of maps. (Id., p. 61; Doc. 63-11, p. 36)  She was marked "not acceptable" for radio. (Doc. 63-11, p. 36)  The Daily Observation Reports question the FTO for "The most satisfactory area of performance" and "The least satisfactory". (Doc. 63-10)  During June 2011, as to least satisfactory, the FTO noted on three days that Gipson was still learning the area of the Sheriff's jurisdiction (on three days), that she needed to use her map book instead of GPS to learn the area so that she could 'arrange meeting points for her back up units before responding to calls" (once), and that she was "still learning the M.C.S.O. procedures" (on two days)  (Doc. 63-11).

Throughout the observation period, under the "most satisfactory" section, the FTO observed that Gipson used proper safety skills in arresting suspects on warrants or making traffic stops; got along well with the other officers; obtained information from a minor victim of a sex crime and the family and "was professional and very sympathetic with the family"; investigated a domestic violence call, determined that a subject should be arrested, "completed the proper paperwork and transported the subject to jail"; made a traffic stop for improper tag, ascertained on the NCIC that the driver had a suspended license and no insurance, issued two citations and a warning ticket, and "was very professional and fair to the citizen"; that she responded to a house fire call, spoke with complainant and the fire department, determined the house was set on fire by a known subject, and "applied the proper charge and completed the proper paperwork";  that she made several traffic stops during one shift, used proper safety, issued a warning ticket, and "was very professional and fair with the citizens"; that Gipson investigated a domestic incident in a bar and "was able to maintain control of all parties who had been drinking" and "remained calm and was able to handle the situation"; that Gipson was on her own for a shift  and shadowed, during which time she "did a good job paying attention to the radio traffic and knowing what was going on with other units that she worked with"; and that Gipson served a warrant on a female felony suspect, used proper safety skills in dealing with the subject, arrested her, and took her to jail.  (Doc. 63-10, 63-11)

The FTO also made at least three specific observations that Gipson wrote several reports and completed the proper paperwork with correct grammar and spelling.  The FTO made at

During this time, Gipson was absent from duty with the Sheriff's Department for military training. (Doc. 63-3)  There are no FTO Weekly Reports for the four-week time period between April 11, 2011 and May 8, 2011, so it appears this is when Gipson was at military training. (Doc. 63-12)  Her field training was extended to ensure that she received eight weeks of field training. (Doc. 63-3)

Gipson returned from her April 2011 military leadership training in May 2011. Gipson testified that during a combined roll call for both shifts: "I basically just remember [Lt. Roderick Bonner] directing his attention to me and saying that I needed to be there." Gipson refers to this incident as blurting out for no reason,  "Deputy Gipson, you need to be here."  (Doc. 63-27, p. 5)

At the completion of field training in May 2011, Gipson was first assigned to "the Alpha part of 100 squad." (Doc. 57-1, p. 21, Bonner deposition) The Alpha squad Sergeants were O'Farrell and Sergeant Robert Miller. (Id., p. 21-22)  Lt. Bonner, Captain Carlos Thompson, Deputy Chief David Wilhelm and Sheriff Cochran were her chain of command. During Gipson's term with Alpha Squad, Lt. Bonner was not aware of any deficiencies documented by Sgt. Miller as to Gipson. (Doc. 63-25, p. 9)  During this time, Gipson went on military leave. [3]

---

least two specific observations that Gipson's appearance was good, her equipment was in order, and she was neat and professional in appearance.  On June 11, the FTO wrote that Gipson "was able to make her own decisions without assistance while handling complaints today" and on June 7, that "Gipson was able to handle herself and make decisions on calls." (Doc. 63-11, p. 27, 35)

[3]  Gipson provided the Court with a copy of Lt. Bonner's letter to Chief Deputy Wilhelm wherein Bonner requests an extension of the Working Test Period. (Doc. 63-3)  In the letter, Lt. Bonner states that Gipson has missed time on duty for attending drills, and references a copy of her military schedule for 2011. However, the schedule is not attached

In September 2011, Gipson was assigned to the Bravo part of 100 squad and her Sergeants were Steven Hale and Todd Friend (Id., p. 23).  Lt. Bonner, Capt. Thompson, Deputy Chief Wilhelm and Sheriff Cochran remained her chain of command.  During this time Gipson went on military leave.

Gipson testified that Deputies Pettway, Watson, and Cooper told her that Lt. Bonner did not like females working in law enforcement and would do whatever it took to get them terminated. (Doc. 63-27, p. 6)[4]  In her answers to interrogatories, Gipson states that while she was assigned to work with Deputy Cooper, Lt. Bonner called her to the Northside Office and told her that she was "progressing well", that he then asked her "numerous personal questions and then commented that '[she] would decide if [she] would be treated as a slut within the department." (Doc. 63-28, p. 4)   At her deposition, Gipson testified that at the station, in the roll call room, with Sgt. Hale present, Lt. Bonner asked Gipson where she lived and "then he said I didn't have to answer the question. He asked who did I live with and he said oh, your son. Then I think that's when he went into saying that I was black and female."  (Doc. 63-27, p 7)  (Gipson's testimony is unclear as to whether there were two conversations with Lt. Bonner wherein he asked personal questions.)

On November 9, 2011, Gipson injured her back while getting into her patrol car and was on injured with pay status until December 16, 2011, when she returned to full duty status.  Gipson was off duty for sixteen 12-hour days. (Doc. 63-3, Lt. Bonner's request for extension)

---

to the letter. Thus, the Court does not have information as to how many days Gipson missed for military service before Lt. Bonner wrote the letter (Doc. 63-3).

[4]  Gipson did not provide the Court with an affidavit or deposition testimony of Deputies Pettway, Watson or Cooper to support this statement.

On December 28, 2011, Lt. Bonner wrote Chief Deputy Wilhelm to request a ninety-

day extension of Gipson's Working Test Period, which was scheduled to end March 2012.

(Doc. 63-3)  Lt. Bonner stated as follows:

> After reviewing the work performance of Deputy Dorothy Gipson, as well as
> her availability for duty since her hiring date of March 21, 2011, I am
> requesting her probationary period be extended of a period of 90 days.
> Deputy Gipson has the potential to be an asset to the Mobile County Sheriff's
> Office however, due to circumstances which may be beyond her control, she
> has missed a great deal of duty time.
>
> When Deputy Gipson was hired by the Mobile County Sheriff's Office, she was
> already a member of the United States Air Force Reserve. Her military drill
> dates have required that she be absent from duty with the Mobile County
> Sheriff's Office. Also, due to her military training dates, I was forced to extend
> her field training four additional weeks to ensure she was trained the eight
> required weeks. Deputy Gipson completed field training, however, there was
> a delay of her release from training status. I have enclosed a copy of Deputy
> Gipson's military training schedule for 2011 which reflects the dates she had
> to report to the Air Force Reserve for military drills and training. Deputy
> Gipson is still in the Reserve and will continue to attend drills and be forced
> to miss time on duty with the Mobile County Sheriff's office. Using the 2011
> schedule as a reference, Deputy Gipson will miss at least six more working
> days prior to completing her now scheduled Probationary period of March
> 2012. We are fully supportive of her mission with the Air Force Reserve
> however, when time is missed with the Sheriff's Office her duty performance
> can not be evaluated.
>
> On November 09, 2011, Deputy Gipson reported that she injured her back
> while getting into her patrol car prior to going on patrol.  As a result of this
> reported injury, Deputy Gipson was placed on Injured With Pay (IWP) status
> from November 09, 2011 until she was released to full duty status on
> December 16, 2011. During this time, Deputy Gipson was absent from duty
> sixteen 12 hour days. Again, this was time that her duty performance could
> not be evaluated by me or her first line supervisor.
>
> When evaluating Deputy Gipson's performance, based on the time she has
> been employed by the Mobile County Sheriff's Office and been present for
> duty, it becomes apparent that Deputy Gipson has a lack in job knowledge or
> lacks the necessary confidence to complete some of her assigned tasks.
> Sergeant Steve Hale has observed that Deputy Gipson will call him on nearly
> all of her calls for service before she takes any action. While it is sometimes
> necessary to contact a supervisor, her repeated calls tend to show a lack of

the basic working knowledge of the laws, rules and regulations needed by a Deputy Sheriff in performance of his/her duties. It is also an indication of a lack of confidence needed to make a decision.

A few recent examples of Deputy Gipson's lack of job knowledge, lack of confidence or reluctance to make a decision, occurred during the month of December 2011:

> I. 12/22/2011 - A citizen met Deputy Gipson at the substation in Semmes and requested that she inspect his car and sign off on a Uniform Traffic Citation he received for No Tag Light Deputy Gipson contacted Sergeant Hale to determine what action to take. The action she took was to advise the citizen to return to the location where he received the citation and then call the sheriff's office. Signing off on an equipment violation citations is [a] common task within law enforcement. When Deputy Gipson was asked why she took the action she took, her reply was that she did not feel comfortable signing off on the citation.

> 2. 12/30/2011- Deputy Gipson issued a warrant slip to Mr. Michael Pond for the arrest of Terry Burdett charging his (sic) with Theft of Services (Case# Slll20847). The facts of the case did not support the charge. Deputy Gipson indicated that Mr. Pond told her that he had contacted his lawyer concerning the matter. It appears that Deputy Gipson issued the warrant slip because of the mention of the lawyer's involvement, not based on the elements of the allegation. Deputy Gipson's action could have caused Mr. Burdett to be wrongly arrested.

Deputy Gipson's absence from duty has impeded my ability to evaluate her performance and her merit as a permanent employee. It can be assumed that most of her noted shortcomings can be directed (*sic*) attributed to her lack of experience. I believe that extending her probationary status an additional 90 days from March 21, 2012 to June 21, 2012 would afford me and her first line supervisor a better opportunity to judge the merit of Deputy Gipson and then make a recommendation for her future employment with the Mobile County Sheriff's Office.

(Doc. 63-3)

On January 12, 2012, Sheriff Cochran made a formal request to the Mobile County

Personnel Board stating as follows:

I am requesting an extension for Deputy Dorothy Gipson's Working Test Period. Deputy Gipson has failed to master basic job skills necessary to be a successful Deputy Sheriff. With further training, it may be possible to assist Deputy Gipson in becoming a fully successful Deputy Sheriff. Therefore, I request her Working Test Period be extended for six months commencing on March 17, 2012 and ending on September 17, 2012.

(Doc. 63-4)

Sheriff Cochran testified that the length of the extension is "three months, six months, depending on . . . whatever is recommended or just whatever my thoughts are at the time." (Doc. 63-26, p. 5). Lt. Bonner and Deputy Chief Wilhelm were unaware of other deputies that were given a six-month extension. (Doc. 63-25, p. 17-18, Bonner deposition; Doc. 63-24, p. 5, Wilhelm deposition)

After the Working Test Period was extended, Gipson was placed with Deputy Cooper, an experienced senior deputy with knowledge of policy, procedures and Alabama law to "train her and answer all the questions - - not formal training, ... but just answer all the questions, show her how to do it on the job." (Doc. 63-25, p, 22-23, Bonner deposition)[5] Lt. Bonner described Deputy Cooper as Gipson's "de facto Training Officer." (Id, p. 23)

No other deputies were assigned to work with Gipson as a "pseudo-training Officer or to assist her during this working period." (Doc. 63-25, p. 119, Bonner deposition) Sgt. Hale testified that he believed that the extension was to provide the additional training that Gipson needed to catch-up for her absences. (Doc. 63-29, p. 7) Capt. Thompson testified Gipson's lieutenant would have been the person to recommend remedial training and that the extension was to provide the remedial training. (Doc. 63-30, p. 16)

---

[5] Gipson stated that the placement with Deputy Cooper lasted two weeks, and cited to page 60 of her deposition in support. However, that page was not included in her exhibits.

On March 1, 2012, Gipson met with Sgt. Hale and Lt. Bonner to discuss her job performance. Two minor issues were discussed. (Doc. 63-25, p. 25, Bonner deposition; Doc. 63-5, Sgt. Hale's Memorandum) ("I spoke with Deputy Gipson in reference to two minor problems that needed to be addressed.") Sgt. Hale testified that Gipson was "doing a little bit better" at that time and that he made clear with Lt. Bonner that he believed Gipson was improving. (Doc. 63-29, p. 46) Lt. Bonner testified that he was "not aware of any major problems or any deficiencies" in Gipson's "work from January through March." (Doc. 63-25, p. 25)

On May 18, 2012, Gipson met again with Sgt. Hale and Lt. Bonner to discuss her job performance. Gipson was told that there were no problems with her work product at that time. (Doc. 63-6, p. 1; "We asked Deputy Gipson if she had any problems she wanted to discuss with us and she stated no. We advised Deputy Gipson that we did not have any problems with her work product at this time.") Sgt. Hale testified that from March to May 2012, he "didn't find any problems" with her work. (Doc. 63-29, p. 11)

On June 16, 2012, Gipson responded to a call for back-up from Senior Deputy Pitzulo. (Doc 63-41, Memorandum from Sgt. Hale to Chief Deputy Wilhelm) Deputy Pitzulo was investigating a suspicious vehicle. He had asked the driver for consent to search, which was given, and had placed the driver in the rear of his patrol car. He asked the female passenger to exit the car. When she did, she placed a backpack on her shoulder. Deputy Pitzulo asked her to place the backpack on the front seat, which she did. He then placed her in front of the vehicle. Deputy Pitzulo searched the car for weapons and then when he searched the backpack he found a small amount of methamphetamine and some loaded syringes. (Doc. 63-41, p.1)

Gipson arrived at the scene and walked up to the vehicle.  Deputy Pitzulo placed the female under arrest.  When he attempted to place handcuffs on her, she turned but he regained control and handcuffed her behind her back.  He then asked Gipson to place the female in her patrol car. Gipson was walking the female to the patrol car while holding her by her right arm.  As Gipson reached to unlock the patrol car door, the female snatched away and ran into the woods.  (Doc. 63-41, p. 2)

As a result of this incident, Sgt. Hale found that Gipson was careless in the performance of her duties and recommended a Letter of Reprimand. (Id.)  Sgt. Hale testified that he did not recommend termination because he believed a Letter of Reprimand was appropriate. (Doc. 63-29, p. 12)  Lt. Bonner concurred with issuing a Letter of Reprimand. (Id., p.13)  Lt. Bonner testified that neither he nor Sgt. Hale, Capt. Thompson, nor Chief Deputy Wilhelm recommended that Gipson be terminated based on the escape. (Doc. 63-25, p. 33).  Deputy Pitzulo was not counseled or reprimanded. (Doc. 63-25, p. 34)

On June 27, 2012, Capt. Thompson and Lt. Bonner met with Gipson and presented the June 21, 2012, Letter of Reprimand.  Capt. Thompson also told Gipson that he had "recommended termination . . . or he was going to terminate [her], something to that effect." (Doc. 63-26, p. 14-15, Gipson deposition)  Gipson and Capt. Thompson discussed the option of her resigning in lieu of termination.  Capt. Thompson told Gipson "that the Sheriff had offered him to offer to [her] the opportunity to resign in lieu of termination" and that he made that offer to her. (*Id.,* p. 14-15)  Gipson responded that she wanted to take the decision to terminate her employment up the chain of command, but Capt. Thompson told her that she did not have appeal rights. (*Id.,* p. 15)

10

Capt. Thompson testified that the "subject of termination probably started with" him and grew out of a conversation with Lt. Bonner wherein he was telling Sheriff Cochran and Capt. Thompson about Gipson's deficiencies. (Doc. 63-30, p. 31, Thompson deposition) Capt. Thompson stated that Gipson was not terminated because of the incident resulting in the Letter of Reprimand, but instead was terminated because "[s]he didn't know her area. She didn't have a working knowledge to do the job.  She contacted her Supervisor or another Deputy on every call she went on.  She utilized her GPS to get around the County. She didn't have a working knowledge of the job." (Doc. 63-30, p. 11, 13-14)

When Capt. Thompson was asked for documentation to support the stated reasons for the termination, he answered that he did not have any documentation or any memorandum up the chain to recommend termination.  (Doc. 63-30, p. 12, 20)  When pressed for other reasons, Capt. Thompson stated:  "She didn't know the job" because "she struggled", referencing the "ticket incident", and also stated that "her job knowledge was severely lacking for someone who should have policed somewhere." (Doc. 63-30, p. 14) However, Capt. Thompson admitted that this conduct occurred prior to the decision to extend her Working Test Period. (Doc. 63-30, p. 14)  When questioned as to "any other reasons, other than the four areas," that lead to termination, Capt. Thompson stated that: "We didn't see any improvement in her performance.  There was no improvement." (Doc. 63-30, p. 15)  But, Capt. Thompson agreed that this reason was contrary to the May 2012 memorandum indicating that Sgt. Hale and Lt. Bonner had told Gipson that there were no problems with her work product. (Doc. 63-30, p. 15)

Sgt. Hale observed Gipson when she was working, he reviewed her reports, monitored where she was on calls, and reviewed her work progress and logs.  In his

opinion, "she was doing her job." (Doc. 63-29, p. 19)  He testified that in the two-month period between March and May 2012, he did not find any problems with her work. (Doc. 63-29, p. 11)  He also testified that after she was assigned to work with Deputy Cooper during the extension, he saw improvement with her report-writing and problems related to paperwork. (Doc. 63-29, p. 2-3).  Sgt. Hale testified that Lt. Bonner discussed his concerns about Gipson after Capt. Thompson brought up the escape at a staff meeting.  (Doc. 63-29, p. 15-16)  Sgt. Hale testified that Lt. Bonner's concerns were the escape and "some other problems . . . with the paperwork and things like that." (Id., p. 16)  Sgt. Hale testified that he was talking to Chief Deputy Wilhelm about the paperwork issues and that he believed that Chief Deputy Wilhelm recommended termination, but did not discuss the matter with Lt. Bonner or Sgt. Hale. (Id)  Sgt. Hale did not recommend termination but only recommended a Letter of Reprimand as to the escape. (Id.).

Lt. Bonner testified that he met with Capt. Thompson, Chief Deputy Wilhelm and Sgt. Hale sometime prior to June 27, 2012 and that the "reason for the termination" was that he "expressed to them it was of [his] opinion that she was marginal at best, and [he] didn't see any upside, based on what he had been told by Sgt. Hale and the documented reports leading up to the extension of the Working Test Period. (Doc. 57-1, p. 25)  Lt. Bonner explained that Gipson "hadn't gotten any better, hadn't gotten any worse" and that  "This was the best we're going to get, so I consider that marginal." (Id., p. 26)

Sheriff Cochran testified that Gipson was not terminated because of the escape and that the decision to terminate was made separately. (Doc. 63-26, p. 7)  Sheriff Cochran testified that the reason for termination was that Gipson was not performing up to standards and that her probation had already been extended. (Doc. 63-26, p. 9)  Sheriff

Cochran testified that it was his understanding that Lt. Bonner and Sgt. Hale, as her supervisors, had recommended termination. (Id.)

When she was terminated, Gipson asked to go up the chain of command, but Capt. Thompson told her that she did not have any appeal rights.  (Doc. 63-27, p. 14)  Gipson filed an appeal with the Mobile County Personnel Board on July 6, 2012. (Doc. 63-27, p. 11)  Lt. Bonner testified that Gipson had the right to request to speak up the chain to Chief Deputy Wilhelm or Sheriff Cochran, and that it would be his responsibility to forward that information up the chain.  However, he could not speak as to whether her request for a meeting would be granted. (Doc. 63-25, p. 30-32)  As to the delay between when she was terminated and filing the appeal, Gipson testified that she "was awaiting the opportunity to appeal to the sheriff, and . . . was advised to file the appeal." (*Id*., p. 12)  Gipson sent a letter to Sheriff Cochran dated June 28, 2012, outlining the discrimination that she perceived she had encountered at the Sheriff's Department (Doc. 63-36).  Sheriff Cochran did not meet with Gipson, rather Deputy Chief Wilhelm met with her (Doc. 63-26, p. 2).   Sheriff Cochran also indicated that by the time he received Gipson's letter, he had learned that she filed a charge of discrimination with the Equal Employment Opportunity Commission and turned the letter over to the legal department (Id. p. 2-3).

III.  Conclusions of law

A. Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a) (Dec. 2010). Rule 56(c) provides as follows:

> **(1) Supporting Factual Positions.** A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
> > **(A)** citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
> >
> > **(B)** showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.
>
> **(2) Objection That a Fact Is Not Supported by Admissible Evidence.** A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.
>
> **(3) Materials Not Cited.** The court need consider only the cited materials, but it may consider other materials in the record.
>
> **(4) Affidavits or Declarations.** An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.

Fed.R.Civ.P. Rule 56(c) (Dec. 2010).

Sheriff Cochran, as the party seeking summary judgment bears "the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial." *Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608 (11th Cir. 1991). The party seeking summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Clark,* 929 F.2d at 608 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553 (1986)).

Once Sheriff Cochran has satisfied his responsibility, the burden shifts to Gipson, as the non-movant, to show the existence of a genuine issue of material fact. *Id.* "In reviewing whether the nonmoving party has met its burden, the court must stop short of weighing the evidence and making credibility determination of the truth of the matter. Instead, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994, 999 (11th Cir. 1992) (citing *Anderson v. Liberty Lobby*, 477 U.S. 242, 255, 106 S. Ct. 2505 (1986)); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-159, 90 S. Ct. 1598, 1608-1609 (1970).

However, "[a] moving party is entitled to summary judgment if the nonmoving party has 'failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof.'" *In re Walker*, 48 F. 3d 1161, 1163 (11th Cir. 1995) (quoting *Celotex Corp.*, 477 U.S. at 323, 106 S. Ct. at 2552). Overall, the court must "resolve all issues of material fact in favor of the [non-movant], and then determine the legal question of whether the [movant] is entitled to judgment as a matter of law under that version of the facts." *McDowell v. Brown*, 392 F.3d 1283, 1288 (11th Cir. 2004) (citing *Durruthy v. Pastor*, 351 F.3d 1080, 1084 (11th Cir. 2003)).

However, the mere existence of any factual dispute will not automatically necessitate denial of a motion for summary judgment; rather, only factual disputes that are material preclude entry of summary judgment. *Lofton v. Secretary of Dept. of Children and Family Services*, 358 F.3d 804, 809 (11th Cir. 2004).  "An issue of fact is material if it is a legal element of the claim under the applicable substantive law which might affect the outcome of the case. It is genuine if the record taken as a whole could lead a rational trier of

fact to find for the nonmoving party." *Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798, 807 (11th Cir. 2010) (citation omitted).

B. <u>Analysis</u>

1. <u>Count I – Violation of the Uniformed Services Employment and Re-Employment Rights Act of 1994 (USERRA)</u>

In Count I, Gipson alleges that Sheriff Cochran violated USERRA because he extended her Working Test Period because of the absences and then terminated her employment during the extended Period.  Gipson also contends that Sheriff Cochran failed to provide her with additional training to qualify her for the position.

USERRA prohibits discrimination against employees on basis of their military service. The statute sets forth, in relevant part, as follows:

> A person who is a member of, applies to be a member of, performs, has performed, applies to perform, or has an obligation to perform service in a uniformed service shall not be denied initial employment, reemployment, retention in employment, promotion, or any benefit of employment by an employer on the basis of that membership, application for membership, performance of service, application for service, or obligation.

38 U.S.C. § 4311(a).

An employer violates the USERRA if the employee's "membership, … service, … or obligation for service in the uniformed services is a motivating factor in the employer's action unless the employer can prove that the action would have been taken in the absence of such membership, … service, … or obligation for service[.]" 38 U.S.C. § 4311(c)(1). "Section 4311 requires proof of a discriminatory motive", and the Eleventh Circuit Court of Appeals employs the "but for" test. *Landolphi v. City of Melbourne, Fla.,* 515 Fed. Appx. 832, 834 (11th Cir. 2013) (quoting *Coffman v. Chugach Support Services, Inc.*, 411 F.3d 1231, 1238 (11th Cir.2005) ("the standard of proof is the 'but for' test")).

"In order to establish a prima facie case of discrimination, the plaintiff must demonstrate by a preponderance of the evidence that his military membership or obligation was a motivating factor in the employer's decision." *Landolphi*, 515 Fed. Appx. at 834*; (*citing *Coffman*, 411 F.3d at 1238)); *Ward v. United Parcel Service,* 580 Fed. Appx. 735, 738 (11th Cir. 2014). "A motivating factor does not necessarily have to be the sole cause for the employer's decision, but is defined as one of the factors that a truthful employer would list as its reasons for its decision." *Id.* "A court can infer a discriminatory motivation from a variety of considerations, such as: (1) the temporal proximity between the plaintiff's military activity and the adverse employment action; (2) inconsistencies between the proffered reason for the employer's decision and other actions of the employer; (3) an employer's expressed hostility toward members of the protected class combined with its knowledge of the plaintiff's military activity; and (4) disparate treatment of similarly situated employees." *Id.*

Once Gipson meets her prima facie burden, the burden shifts to Sheriff Cochran to "establish an affirmative defense by proving by a preponderance of the evidence that legitimate reasons, standing alone, would have induced [him] to take the same adverse action. *Id.* at 834-835 (citing *Coffman*, 411 F.3d at 1238-1239)).  Sheriff Cochran "does not violate USERRA if [he] can prove that the action would have been taken in the absence of the military service." *Preacely*, 588 Fed.Appx. at 997.[6]  This burden-shifting framework

---

[6]  "The procedural framework and evidentiary burdens set out in § 4311, as explained in Transportation Management for NLRB rulings, are different from those in discrimination cases under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–2(a)(1), as described in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and subsequent decisions. *McDonnell Douglas*, while allocating the burden of production of evidence, does not shift the burden of persuasion to the employer. *See Nat'l Labor Relations*

"applies to both so-called 'dual motive' cases and so-called 'pretext' cases." *Coffman,* 411 F.3d at 1238.

To rebut the proffered reasons, Gipson "may establish pretext indirectly by showing" that Sheriff Cochran's proffered reasons for his decision are "unworthy of credence." *Landolphi,* 515 Fed. Appx. at 835. "Under this analysis, courts must evaluate whether [Gipson] demonstrated such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the proffered reason so that a reasonable factfinder could conclude that it is unworthy of credit." *Id.* Proof that Sheriff Cochran's "justification is unworthy of credence may be probative of discrimination, and may therefore, permit a factfinder to reasonably find discrimination." *Id.* (citing *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 147–48, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000)).

a. Extension of Gipson's Working Test Period

Sheriff Cochran does not dispute that Gipson's military status was a factor in extending her Working Test Period, but argues that it was not a "motivating factor." (Doc. 56, p. 8) He explains that the extension was requested because of absences from both Gipson's military leave and her injured with pay status which prevented her from gaining the necessary experience to become a Deputy Sheriff and allowing her supervisors time to

---

*Bd. v. Weiss Memorial Hospital,* 172 F.3d 432, 442 (7th Cir.1999) (contrasting *Wright Line* with "the shifting burdens of production under the ubiquitous *McDonnell Douglas* analysis, which is merely a method for ordering the proof"); *Walker v. Mortham,* 158 F.3d 1177, 1184–85 n. 10 (11th Cir.1998), cert. denied 528 U.S. 809, 120 S.Ct. 39, 145 L.Ed.2d 36 (1999) (distinguishing the employer's burden to prove its affirmative defense under the NLRA from the *McDonnell Douglas* prima facie case, which shifts the burden of production but not the risk of nonpersuasion). Thus in USERRA actions there must be an initial showing by the employee that military status was at least a motivating or substantial factor in the agency action, upon which the agency must prove, by a preponderance of evidence, that the action would have been taken despite the protected status. " *Sheehan v. Department of Navy*, 240 F.3d 1009, 1014 (Fed. Cir. 2001).

evaluate her performance.  His position is supported by the information contained in Lt. Bonner's letter requesting an extension. (Doc. 63-3)  However,  Sheriff Cochran argues that the extension was not an adverse action.

Gipson responds that the extension was adverse. She proffers that had her Working Test Period not been extended for six months, she would have become a permanent employee before she was terminated in June.[7]  Thus, Gipson argues that she would have had certain property rights in her employment at that time including the right to a pre-disciplinary hearing before her termination and an appeal, and that Sheriff Cochran would have had the heightened burden to support her termination by a preponderance of the evidence.[8]   She also argues that the extension resulted in a lack of prestige and a lack of stability.

---

[7]  Gipson relies upon the ratings of acceptable and comments of good performance and, the satisfactory observations noted by her Training Officers from March 2011 through June 2011, the absence of any significant deficiencies in performance noted in her record for the ten months between hiring in March 2011 and December 2011 but for those identified in the request for extension, and the absence of any significant deficiencies between December 2011 and March 2012 – the time when her one-year Working Test Period would have ended - but for the two minor items discussed in the March 2012 memorandum from Lt. Bonner and Sgt. Hale to Gipson.

Gipson also relies on Chief Deputy Wilhelm's testimony and argues that he stated Gipson would have been a permanent employee in June 2012 had her Working Test Period not been extended.  (*See* Doc. 63-24, p. 167-168)  It is too far of a stretch to say that this testimony supports this conclusion.  The question began with "if", was compound and ended like the previous question, with a query whether a permanent employee would have been due a disciplinary hearing.

[8]  Gipson references Personnel Board Rule XI, which states that during a working test period, an employee does not have the right to a pre-disciplinary hearing, the right to file a grievance or appeal a dismissal and does not have a property interest in the position. (Doc. 63-35)  She also asserts that probationary employees may be terminated on lesser grounds and without any supporting evidence.

The Court finds that Gipson's extension of her Working Test Period was not an adverse employment action.  Specifically, the extension did not <u>alter</u> in any way Gipson's employment status.  It is too speculative to assume that she would have become a permanent employee at the conclusion of her Working Test Period in March 2012.  Moreover, USERRA was certainly never intended to allow a person to be exempt from necessary and important training for a job.  Thus, extending a training period, in part, to make up for absences due to military leave, does not violate USERRA, and in fact is contemplated by USERRA. *See* 38 U.S.C. § 4313(a)(1)(B) (requiring an employer to make reasonable efforts to qualify an employee that has been absent for military service).

b. <u>Termination</u>

Sheriff Cochran argues that there is no evidence that Gipson's military leave factored in to her termination and that even if it did, she would have been terminated anyway.  Sheriff Cochran states that Gipson had three years prior experience as a police office and was given over a year to develop the experience and expertise to be a Deputy Sheriff, but the "consensus was that she was just not cutting it" (doc. 56, p. 9).   Sheriff Cochran stated that Gipson was a "marginal employee" and there was no reason to continue her employment. (Id.)

Gipson responds that this assertion is false and not supported by the evidence. She argues that the reasons for termination are contrary to the evidence, because in May 2012, a month before her termination in June 2012, Sgt. Hale and Lt. Bonner stated that she had no work-related problems.  Gipson argues that the reasons Capt. Thompson gave to support his opinion that she could not do the job were reasons alleged in support of extending her Working Test Period in December 2011.  Then, when Capt. Thompson stated

that she had shown no improvement since that time, Gipson pointed out that in May 2012,

just a month before her termination, Lt. Bonner and Sgt. Hale informed her that they had no

problems with her work.  Gipson also argues that Capt. Thompson never personally

observed her work whereas her immediate supervisor Sgt. Hale testified that she was

improving.  Gipson also points out the absence of any written documentation to support

Capt. Thompson's decision.  Gipson also argues that Deputy Chief Wilhelm testified that the

only documentation between January 2012 and June 2012, are the March 2012 and May

2012 memoranda, and neither indicate that Gipson was below standard and needed to be

terminated.

    The Court finds that Gipson has failed to show by a preponderance of the evidence

that her military service was a factor in the decision to terminate her employment, and

therefore, she has failed to make her prima face case. *Landolphi*, 515 Fed. Appx. at 834 ("In

order to establish a prima facie case of discrimination, the plaintiff must demonstrate by a

preponderance of the evidence that his military membership or obligation was a

motivating factor in the employer's decision.")   There is simply no evidence that Gipson's

military service factored in to Capt. Thompson's decision, such as was shown in Lt.

Bonner's request for an extension of the Working Test Period.  Nor can the Court infer a

discriminatory motivation based on the temporal proximity between Gipson's military

activity and the adverse employment action.  Gipson has failed to present any evidence as

to whether she may have been on military leave in close temporal proximity to June 27,

2012.  Moreover, although "an employer's expressed hostility toward members of the

protected class combined with its knowledge of the plaintiff's military activity", *id.*, may

give rise to an inference, Gipson presents only Lt. Bonner's one statement at roll call in May

2011 – "Deputy Gipson, you need to be here".  This statement alone, made over a year

before termination is not sufficiently hostile to support an inference that Gipson's military

service was a factor in her termination.

Lastly, "disparate treatment of similarly situated employees", *id.*, may give rise to an

inference that military service was a factor in the decision.  In this regard, Gipson

references the Court to her argument in support of her sex discrimination claim under Title

VII, that male patrol officers were treated more favorably although they had similar

deficiencies in performance.  However, Gipson fails to explain how these are similar

comparators under her USERRA claim; that is that other probationers had periods of

absence, and had deficiencies in performance, but their Working Test Period was not

extended.   The Court sees no reason to do that for her.

c. Additional training required under USERRA

Gipson alleges that Sheriff Cochran violated USERRA because after her military

service, he failed to provide her with additional training necessary to qualify her as a

permanent deputy. (Doc. 1)  Sheriff Cochran argues that Gipson received the additional

training in that her Working Test Period was extended for six months in lieu of terminating

her and to provide her the opportunity to gain the necessary experience; and thus the

extension was a reasonable effort to qualify her.  He also argues that assigning Gipson to

work with a more experienced Deputy was a reasonable effort. (Doc. 56, p. 9)

Gipson disagrees with Sheriff Cochran. She argues that a permanent deputy position

is the position she would have had at the end of Working Test Period in March 2012, if she

had not taken military leave.  Thus, if Sheriff Cochran thought she was not qualified for a

permanent position, he should have provided her with additional or specific training in

addition to the extension and assignment. She argues summary judgment should be denied because there is an issue of fact as to whether his actions were reasonable.

 If the period of service was 91 days or less, USERRA requires that the service member be "reemployed" in "the position of employment in which the person would have been employed if the continuous employment of such person with the employer had not been interrupted by such service, the duties of which the person is qualified to perform[.]" 38 U.S.C. § 4313(a)(1)(A).   But if the employer finds the person is not qualified for the position, then USERRA requires the employer to make "reasonable efforts" to qualify the employee. Id. at (B); 20 C.F.R. § 1002.198; 20 C.F.R. 1002.196(a). 20 C.F.R. 1002.5(I) "Reasonable efforts, in the case of actions required of an employer, means actions, including training provided by an employer that do not place an undue hardship on the employer."  20 CFR § 1002.5(i).

Viewing the evidence in the light most favorable to Gipson, the Court finds that there is no material dispute of fact that Sheriff Cochran made reasonable efforts to qualify Gipson for the permanent deputy position and therefore, summary judgment is granted in favor of Sheriff Cochran as to this claim.  Lt. Bonner noted in his request for extension that Gipson when evaluating Gipson's performance, "based on the time she has been employed . . . by and been present for duty" he found that she "has a lack in job knowledge or lacks the necessary confidence to complete some of her assigned tasks." (Doc. 63-3) In response, her Working Test Period was extended to allow her more time to gain the necessary experience[9] and she was assigned to work with a more senior deputy who could function

---

[9]  Sgt. Hale and Capt. Thompson both testified that the extension was to provide the additional or remedial training that Gipson needed. (Doc. 63-29, p. 7; Doc. 63-30, p. 16)

as her Training Officer and answer her questions.[10] Gipson has not sufficiently rebutted this evidence.

2. Count II – Gipson's claim of sex discrimination pursuant to Title VII

Gipson alleges that she was subjected to disparate treatment on basis of her sex. She alleges that similarly situated male deputy sheriffs were treated differently in regard to the terms and conditions of employments, application of work rules, extension of probation, and termination. (Doc. 1)

Under Title VII, it is unlawful for Sheriff Cochran, an employer, "to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's … sex." 42 U.S.C. § 2000e–2(a)(1)).  "In order to establish a case under Title VII, a plaintiff may use three different kinds of evidence of discriminatory intent: direct evidence, circumstantial evidence or statistical evidence." *Standard v. A.B.E.L. Services, Inc.*, 161 F.3d 1318, 1330 (11th Cir.1998).  Gipson relies upon circumstantial evidence.

In Title VII disparate treatment actions based upon circumstantial evidence, the burden lies first with Gipson to establish a prima facie case.  *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1087 (11th Cir. 2004) (citing *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817 (1973) and *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089 (1981).  Gipson may establish a prima facie case of sex discrimination by showing that: (1) she was a member of a protected class; (2) she was qualified to do the

---

[10]  Lt. Bonner testified that Deputy Cooper was an experienced senior deputy with knowledge of policy, procedures and Alabama law and could train Gipson "and answer all the questions - - not formal training, … but just answer all the questions, show her how to do it on the job." (Doc. 63-25, p, 22-23, Bonner deposition)

job; (3) she was subjected to an adverse employment action by her employer; and (4) similarly situated employees outside of the protected class were treated more favorably. *Wilson,* 376 F. 3d at 1091.

As to the third element, an "adverse employment action is not only an element of the prima facie case, but an element of the claim itself." *McCone v. Pitney Bowes, Inc.*, 582 Fed.Appx. 798, 800 (11th Cir. 2014) (quoting *Holland v. Gee*, 677 F.3d 1047, 1056 (11th Cir. 2012). An adverse employment action is "a serious and material change in the terms, conditions, or privileges of employment." *Id.* (internal citation and emphasis omitted). "The employee's subjective view of the significance and adversity of the employer's action is not controlling. Rather, the employment action must be materially adverse as viewed by a reasonable person under the same circumstances." *Id.* (internal citation omitted).

Generally, firing an employee is a significant change in employment status that is an adverse employment action. *See Davis v. Town of Lake Park, Fla*., 245 F.3d 1232, 1239 (11th Cir.2001). However, "[c]riticisms, negative evaluations and temporary and non-substantial changes in work assignments are not actions that have a 'serious and material effect' on the terms and conditions of employment." *White v. Hall,* 389 Fed. Appx. 956, 960 (11th Cir. 2010) (citation omitted).

Additionally, "memoranda of reprimand or counseling that amount to no more than a mere scolding, without any following disciplinary action, do not rise to the level of adverse employment actions sufficient to satisfy the requirements of Title VII." *Barnett v. Athens Regional Medical Center Inc.* 550 Fed. Appx. 711, 713-714 (11th Cir. 2013) (citing *Davis,* 245 F. 3d at 1236). "The negative evaluation must actually lead to a material change in the terms or conditions of employment[.]" *Id.* "Although proof of direct economic

consequences is not required in all cases, 'the asserted impact cannot be speculative and must at least have a tangible adverse effect" on the employment. *Id.*

As to the fourth element, Gipson and the similarly situated employees she identifies as her comparators, "must be similarly situated 'in all relevant respects.'" *Wilson,* 376 F. 3d at 1091. "The comparator must be nearly identical to the plaintiff to prevent courts from second-guessing a reasonable decision by the employer." *Id.* (citation omitted). Where there are allegations of discriminatory discipline, establishing the fourth element "requires showing a similarly situated employee, who was engaged in the same or similar misconduct but did not receive similar discipline." *Archie v. Frank Cockrell Body Shop, Inc.*, 581 Fed. Appx. 795, 798 (11th Cir. 2014) (citation omitted). The "quantity and quality of the comparator's misconduct" must be " 'nearly identical' " to prevent judges from second-guessing employers' reasonable decisions." *Archie*, 581 Fed. Appx. at 798.

If Gipson establishes her prima facie case, then she creates a rebuttable presumption of unlawful sex discrimination and the burden of production shifts to Sheriff Cochran to articulate legitimate, nondiscriminatory reasons for his actions. *Wilson*, 376 F.3d at 1087. If Sheriff Cochran meets this burden, then the presumption of discrimination is rebutted, and the burden shifts back to Gipson to show that the Sheriff's proffered reasons are a pretext for illegal discrimination. *Id.*

To do so, Gipson must show both that the reasons were false, and that discrimination was the real reason. "A 'new level of specificity' applies to the inquiry at this step, in which the plaintiff must demonstrate 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence.'"

*Archie*, 581 Fed. Appx. at 798.  "If the proffered reason might motivate a reasonable employer, a plaintiff cannot merely recast the reason, but must 'meet the reason head on and rebut it.'" *Id,* at 798-799 (quoting *Chapman v. AI Transp.*, 229 F.3d 1012, 1030 (11th Cir.2000) (en banc).

If Gipson makes her prima facie case, and a reasonable jury could disbelieve Sheriff Cochran's proffered legitimate reasons for the alleged discriminatory actions, the "court cannot grant summary judgment to the defendants." *Keene v. Prine*, 477 Fed. Appx. 575, 581 (11th Cir. 2012) (citing *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 148, 120 S.Ct. 2097, 2109 (2000) ("[A] plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated.").

a. Extension of the Working Test Period

Sheriff Cochran argues that the extension was not an adverse employment action; therefore, Gipson cannot meet the third element of her prima facie case. He argues that in the face of the absences caused not only by military leave but also due to Gipson's Injured-with-Pay status resulting from her back injury, his options were to extend the Working Test Period or terminate her, based upon the opinions of her Supervisors that she was not satisfactorily performing her duties at that time.

Alternatively, assuming the extension was an adverse employment action, Cochran argues that there were legitimate, non-discriminatory reasons for the extension. Specifically, Gipson had not had a sufficient training period as evidenced by Lt. Bonner's request for an extension and documentation of two instances of lack of job skills.  Sheriff Cochran also argues that Gipson had no right to permanent status at the end of the Working

Test Period and that it is only speculation on her part that she would have achieved that status at the end of one year or at the end of any extension.

Gipson argues that the 6-month extension is an adverse employment action and thus she meets the third element of her prima facie case.  Gipson argues that if her Working Test Period had not been extended for six months or extended for only 90 days, then based on her record  she would have become a permanent deputy June 21, 2012.  Gipson argues that because she was not made permanent, she was precluded from receiving a property interest in her job and certain rights and benefits. Specifically that she would have been entitled to a pre-disciplinary hearing before she was terminated on June 27, 2012, Sheriff Cochran would have to meet a higher burden to terminate her, and she could have appealed that decision.  She also argues that the extension and denial of a permanent position resulted in a lack of stability and loss of prestige.

Overall, Gipson's adverse component is based on the premise that she would have been a permanent employee in June 2012 when she was terminated and would have had a property interest in her position and certain rights and protections.  Under the Mobile County Personnel Board Rule XI, an employee in a working test period does not have a right to a pre-disciplinary hearing and does not have a property interest in his or her position until the working test period "has been successfully completed." (Doc. 63-35, Rule XI "Working Test Period")  The Rule also provides that "The [Personnel Board] Director may extend the working test period of any appointee upon the request of the Appointing Authority. . . .  If not removed during the working test period or any extension thereof, the employee shall be deemed to have earned permanent status." (Id.)  The Rule contemplates

a successful completion of the Working Test Period and "if not removed," the employee will earn permanent status.

For reason previously stated, the Court finds that the extension of Gipson's Working Test Period was not an adverse employment action.   Accordingly, Gipson fails to establish her prima facie case of discrimination.

However, assuming for purpose of this summary judgment that Gipson could make a prima facie case, the burden of production shifts to Sheriff Cochran to articulate legitimate, nondiscriminatory reasons for his actions. *Wilson*, 376 F.3d at 1087.   If Sheriff Cochran meets this burden, then the presumption of discrimination is rebutted, and the burden shifts back to Gipson to show that the Sheriff's proffered reasons are a pretext for illegal discrimination. *Wilson*, 376 F.3d at 1087.  Gipson must show both that the reasons were false, and that discrimination was the real reason for the decision to terminate her employment.  She must "demonstrate 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence.'" *Archie*, 581 Fed. Appx. at 798.  If Sheriff Cochran's "proffered reason might motivate a reasonable employer", Gipson "cannot merely recast the reason, but must 'meet the reason head on and rebut it.'" *Id.,* at 798-799.

In that regard, Sheriff Cochran states that the extension was necessary for Gipson to have time on duty to gain more experience and to allow her Supervisors an appropriate amount of time to observe and evaluate her work.  Sheriff Cochran states that Gipson was not performing as evidenced by Lt. Bonner's statements in the request for extension that Gipson lacked knowledge of the procedures and lacked confidence.   He points out that Sgt.

Hale and Lt. Bonner both believed that part of the reason Gipson was not performing was because of the time away from work.

In rebuttal, Gipson argues that there is no factual basis for the extension because she had no documented deficiencies during the ten-month period between her employment in March 2011 and the request in December 2011, that the two December incidents outlined in the request for extension were minor, and that she had been rated as acceptable and had good comments during her initial training period. Gipson also argues that the fact that her extension was for six-months as opposed to the customary 90 days coupled with the lack of an explanation[11] as to why she was extended for 6 months is evidence that Sheriff Cochran's reasons are false.

The Court finds that Gipson has failed to proffer sufficient evidence from which a reasonable jury could find that Sheriff Cochran's reasons were false and his real reason for the extension was sex discrimination. Although Gipson argues that there are no documented deficiencies, Lt. Bonner's request for the extension contains sufficient documentation of two specific issues – lack of knowledge and lack of confidence - that he and Sgt. Hale observed that may motivate a reasonable employer to extend the Working Test Period in order to further evaluate a probationary employee. Accordingly, summary judgment is granted in favor of Sheriff Cochran as to Gipson's claim of sex discrimination under Title VII as to the extension of her Working Test Period.

b. Termination

---

[11] Sheriff Cochran testified that the length of the extension is "three months, six months, depending on . . . whatever is recommended or just whatever my thoughts are at the time." (Doc. 63-26, p. 5)

Sheriff Cochran acknowledges that Gipson is a member of a protected class and that she was subject to an adverse employment action, *i.e.,* a termination.  Sheriff Cochran argues that Gipson cannot meet the fourth element of her prima facie case that she was terminated on basis of her sex, because she cannot identify any comparators that are similar situated who were treated differently.  He argues that because the deputies identified were not similarly situated or did not engage in similar conduct, the application of different work place rules does not constitute discrimination. [12]

The Court finds that Gipson has presented sufficient evidence to create an issue of material fact as to whether she was terminated based on her sex.  Accordingly, Sheriff

---

[12]   Gipson proffered Officer Pitzulo, but he is not similarly situated in that he was a permanent Deputy and did not engage in substantially the same conduct as Gipson.  Also, there is no evidence that he had problems with decision-making or general knowledge of the criminal code or was a marginal employee.

Gipson proffers Deputy William Pines. However, Sheriff Cochran states that Deputy Pines did not make permanent status and was terminated. (Doc. 63-25, p. 62-63, Bonner deposition)  Thus, Pines was not treated more favorably than Gipson.

Gipson proffers Deputy Wesley Barnett.  However, Deputy Barnett was offered the option of either resigning or being terminated and he resigned. (Doc. 63-25, p. 62-63, Bonner deposition) Thus, Barnett was not treated more favorably than Gipson.

Gipson proffers Deputy Demetrius Watts who was hired on October 3, 2011, and was also subject to a Working Test Period and the same chain of command.  Deputy Watts received reprimands for reckless driving, failure to report to work, a citizen complaint, failure to write a report and a suspension for unauthorized leave.  However, despite his issues, Deputy Watts resigned in lieu of termination, before his Period ended.  Thus, Watts was not treated more favorably than Gipson. (Doc. 63-25, p. 67-68; Doc. 66, Exhibit 9, excerpts from Watts' personnel file)

Gipson proffers Deputy Darryl Gomien.  However, the deposition testimony to which she cites, page 223 of Lt. Bonner's deposition is not in the record and the Court cannot verify whether Gomien was terminated for his infractions or insufficiencies.

Cochran's motion for summary judgment is denied as to Gipson's claim of sex discrimination based on her termination.

IV. <u>Conclusion</u>

Upon consideration of the evidence and for the reasons set forth herein, Sheriff Cochran's motion for summary judgment is GRANTED in part, but DENIED, as to Gipson's claim of sex discrimination under Title VII based upon her termination.

DONE and ORDERED this 3rd day of March 2015.

<u>s/ Kristi K. DuBose</u>
KRISTI K. DuBOSE
UNITED STATES DISTRICT JUDGE